**Richard Lee GRIFFIN,
Petitioner/Appellant,**

v.

**Teresa Lynn Ward Griffin STONE,
Respondent/Appellee.**

Court of Appeals of Tennessee,
Western Section,
at Jackson.

Jan. 15, 1992.

Application for Permission to Appeal
Denied by Supreme Court
April 27, 1992.

Robert C. Wilder, Ripley, for petitioner, appellant.

Robert C. Rosenbush, Memphis, for respondent, appellee.

TOMLIN, Presiding Judge, Western Section.

This is a child custody case. Richard Lee Griffin ("Father") filed a petition in the General Sessions Court of Tipton County seeking to modify a final decree of divorce whereby custody of the parties' two minor children was given to Teresa Griffin Stone ("Mother"). Alleged as "changed circumstances" was physical and mental abuse of the children by Mother and her present husband while in their custody. At the conclusion of a bench trial, with the Honorable Gary F. Antrican, Special Judge presiding, a change of custody *per se* was denied. However, the court gave Father and Mother joint custody, but with the children's residence to remain with Mother. Before an order was entered on the custody proceeding Mother filed a *Scire Facias* petition seeking to have Father held in contempt for refusing to return the children to Mother at the end of a visitation period. Following another hearing, the petition for contempt was dismissed. Father has appealed from both final judgments. The single issue presented by this appeal is whether the trial court erred in declining to change custody of the parties' two children from Mother to Father. We are of the opinion that the court erred in this regard and thus, we reverse.

■ Contrary to the perception of the law as set forth in Father's brief, it has now been settled in child custody cases that a finding by a trial court comes to this court with a presumption of correctness. We therefore review the record *de novo* in accordance with that presumption, and, absent an error of law, we must affirm, unless we find that the evidence preponderates against such findings. Rule 13(d) T.R.A.P. *See Hass v. Knighton*, 676 S.W.2d 554 (Tenn.1984).

■ In child custody cases, the law is well established that where a decree has been entered awarding custody of children, that decree is *res judicata* and is conclusive in a subsequent application to change

custody unless some new fact has occurred which has altered the circumstances in a material way so that the welfare of the child requires a change of custody. *Long v. Long*, 488 S.W.2d 729 (Tenn.App.1972); *Walker v. Walker*, 656 S.W.2d 11 (Tenn. App.1983). In child custody cases, the paramount concern of the court is the welfare of the children, and the rights of the parties will yield to that concern. *Dantzler v. Dantzler*, 665 S.W.2d 385 (Tenn.App.1983).

Before addressing the issue at hand, the court wishes to attempt to clarify the procedure that took place in the trial court. This litigation began with the filing of a petition to modify the final divorce decree, seeking a change of custody. The petition was filed in October, 1990. A hearing was had in January, 1991 with a special judge presiding. The record does not reflect why the regular sitting judge did not preside. The matter was continued until February 11, 1991 in order to permit an investigation by and the filing of a report by representatives of the Tennessee Department of Human Services ("TDHS"). At the February 11, 1991 hearing, this report was received by the court, along with testimony of Father, Mother, and their respective witnesses, some of whom were TDHS representatives. At the conclusion of that hearing, the trial court found that there had been a change of circumstances "to some degree." After reviewing some of the evidence, the court stated:

> What the Court is going to order is this. There has been a change of circumstances. The Court is not convinced that the children would be better off living under the complete custody of the father. What the Court is going to do within this Order is give joint custody. The children are to live with the mother with visitation being the same.
>
> I will make this one warning. If anything happens and this Court is shown that these things are still happening, unless I have some justifiable reason for that to happen, custody will be awarded to the father.
>
> Custody is joint. Nothing has changed except for that.

Soon after this hearing Father had the two minor children in his custody for weekend visitation. During this time, the older child, Nicholas, five years of age, described a restraining technique that had been used on him by his Mother and stepfather, which Father was previously unaware of. As a result of this new information, at the end of the visitation period Father refused to return either child to their Mother, notwithstanding the existence of a court order to that effect. Father did not consult with his attorney, although he apparently consulted with representatives of TDHS.

As a result of the refusal of Father to surrender the children, Mother filed a petition seeking to have Father cited for contempt of court. A full hearing was held on this contempt petition on March 18, 1991. At the conclusion of same the trial court dismissed the petition. The order of dismissal in no way touched on the matter of custody. This order was entered by the trial court on April 2, 1991. Father's notice of appeal, filed six days later, states that an appeal is taken from both the final order in the custody proceeding as well as the final order in the contempt proceeding. However, the notice of appeal states that the only issue being appealed is the matter of custody.

As this court views it, the parties have in some measure at least treated the contempt proceeding as an extension of the custody hearing, inasmuch as the refusal of Father to surrender the children following visitation was based upon acts of alleged mistreatment of these children by Mother and her husband. Accordingly, this court is going to allow the transcript of the second hearing to be considered along with the transcript of the first hearing as to the issue of custody by stipulation of the parties.

Father's proof consists of three aspects of alleged abuse: (1) the existence of poor personal hygiene of the children; (2) the use of excessive force in spanking the children; and (3) the use of excessive force in restraining Nicholas, the older child.

We are dealing with young children. At the time of the February, 1991 hearing,

Nicholas was five years of age and J.W. just barely three. Father testified that in late 1989 and early 1990 he observed that the children's personal hygiene was poor. In February, 1990 J.W. had a big spot on his buttocks, swollen and full of pus, according to Father. In July, 1990 he again noticed J.W. with bruises on his buttocks and also observed that his ears were infested with fleas and had become infected. Photographs taken by Father at this time revealed bruises on the buttocks consistent with a spanking by means of a belt. Father stated that Nicholas was being punished by Mother and her husband if he did not refer to his stepfather as "daddy" or if he talked about coming to live with Father. Father further testified that all of this was causing Nicholas to have nightmares. In August, 1990 Father contacted TDHS and requested an investigation of Mother's home and the treatment of the children.

Father further testified that in the fall of 1990 he observed more bruises on both of the children. He contended that Nicholas had bruises consistent with strap marks on his back and buttocks and that J.W. was observed with bruises on his middle back and buttocks. Photographs of J.W. were presented in support of Father's contentions. Father conceded that from November, 1990 until the February, 1991 hearing he had observed no further evidence of any alleged physical abuse of either child.

Two representatives of TDHS testified. A Ms. Nelson testified that she made an inspection of the home following the July, 1990 complaint. Both Mother and stepfather at that time admitted spanking the children, as well as using the belt, but they contended they did so only as a last resort. She observed bruises on Nicholas at that time. Father had alleged that the whippings took place with a "concho belt," a leather belt with metal studs in it. However, both Mother and stepfather denied using any such belt. Following an October, 1990 allegation of mistreatment, Ms. Nelson made another visit to the home and observed bruises on one of the children.

Ms. Nolen, a social counselor for TDHS, testified that a safety plan was put into effect with Mother and her husband in August, 1990, whereby it was requested by TDHS and agreed to by Mother and her husband that until further notice they would administer no corporal punishment to these children.

Through cross examination of Mother, Father established that her brother and his girl friend lived with Mother, her husband and the children for some three weeks, at a time when they were not married, and that they did sleep together. She denied that they slept in the same room with the children. However, the stepfather admitted that they did sleep on a mattress on the floor in the children's room, but stated that "they didn't go to bed until after the children were asleep." There was no direct proof of any sexual activity in the presence of the children.

Lastly, Father testified as to the complaints made to him by Nicholas during the visitation period in early March, 1991 following the custody hearing. Nicholas described to Father what has been referred to as a "choke hold" type of discipline, used allegedly by both Mother and stepfather on him. This consisted of laying the child face down, pulling his hands behind his back and the placing of a knee or foot on the back of the head. Nicholas testified that this scared him and in addition inhibited his breathing. The record further reflects that Nicholas has an asthmatic condition.

Following a complaint by Father, Ms. Nolen, Mother's case worker, investigated the matter. She stated that Nicholas told her that both Mother and stepfather had used this restraint on him often, stating that it was done to him after he had been bad. Nicholas said he was afraid of being held down. She stated that Mother admitted using this restraint, but did not specify exactly when. Ms. Nolen testified that it appears that this restraint technique was suggested to Mother and her husband by a counselor at the Tri–County Counseling Center, to be used on unruly children. She testified further that TDHS approved of this method of restraint to be used even on a five year old, in the event the child was unruly.

After considerable debate with both counsel, the trial court concluded that it would be desirable to interrogate Nicholas, the five year old. This was done in the jury room with only the judge and court reporter present. After several illustrations of what it meant to tell the truth and what would happen if one did not tell the truth, the court asked Nicholas several questions about the restraint procedure allegedly used upon him. Nicholas described his being placed on the floor, with arms held behind his back and a foot or knee being put against his head and being held down. He indicated that both his Mother and stepfather had done this to him in the past. He further stated that it hurt and he could not breathe. This was done to him after he had thrown a fit.

There were other secondary bits of evidence introduced, particularly in the first hearing. First, apparently because of ongoing difficulties between Mother and Father when Father exercised his regular visitation rights, he would travel to Mother's home in the company of a police officer. This caused some consternation in the neighborhood.

The report of TDHS of the parties' respective homes initially showed that Father had an attractive home situated in the country on nine acres with horses and other animals. On the other hand, the initial visits to Mother's home portrayed a somewhat unkempt and slightly soiled surroundings. Other evidence indicated that later on these conditions improved.

In the opinion of this Court, the following remarks made by the late Judge Avery in *Bevins v. Bevins,* 53 Tenn.App. 403, 383 S.W.2d 780 (1964) are most apropos here:

The real matter to be considered is what is the best thing to do with these children that they may be left in a home where they are nurtured, loved, appreciated and where the environment is such that is conducive not only to the physical welfare of the child, but to its emotional and moral welfare, and where it can have the instructions from those who have control over it to inspire it to activities so as to develop a personality prepared for a life

of service, and to successfully compete in the society which the child faces when an adult.

*Id.* at 783.

In *Bah v. Bah,* 668 S.W.2d 663 (Tenn. App.1983), in an excellent opinion by Judge Conner, he stated that "the child's best interest is the paramount consideration. It is the polestar, the alpha and omega ..." *Id.* at 666.

The *Bah* court continued by stating:

This is and must remain the true test for the award of custody. To arrive at the point of deciding with whom to place a child in preparation for a caring and productive adult life requires consideration of many relevant factors, including but certainly not limited to the age, habits, mental and emotional make-up of the child and those parties competing for custody; the education and experience of those seeking to raise the child; their character and propensities as evidenced by their past conduct; the financial and physical circumstances available in the home of each party seeking custody and the special requirements of the child; the availability and extent of third-party support; the associations and influences to which the child is most likely to be exposed in the alternatives afforded, both positive and negative; and where is the greater likelihood of an environment for the child of love, warmth, stability, support, consistency, care and concern, and physical and spiritual nurture.

*Id.*

In approaching this issue, we also follow *Bah* in that we have applied what the *Bah* court called the "doctrine of comparative fitness," noting that "[t]here are literally thousands of things that must be taken into consideration in the lives of young children, ..., and these factors must be reviewed on a comparative approach." *Id.* As in *Bah,* this Court must determine which of two available custodians is more or less fit than the other.

We also wish to emphasize that it is not necessary to find that Mother is an unfit parent in order to award custody of these children to Father, or for that matter to a

third party, when it is in the children's best interest. This Court has the responsibility of placing the children in a home for rearing with the person or persons it deems most fit to do so.

While this decision in some respects has not been an easy one to reach on this record, this Court is of the opinion that there has been more than a slight change in circumstances affecting the welfare of these children. We feel there has been a material change of circumstances affecting their welfare, and accordingly, we hold that the trial court erred in granting joint custody to Mother and Father and leaving the Mother's residence as the place of domicile. Based upon this record, we are satisfied that the best interests of the children would be served by awarding custody of them to Father, with liberal visitation privileges to Mother. We repeat for the sake of emphasis that in order to place these children in the custody of their Father, it did not require that this Court find Mother to be an unfit parent, nor do we make any finding that she was and is unfit.

Having said this, we would give words of caution to both parents. Regardless of who has custody of these children, each parent has an unfettered obligation to love, nurture and care for these children. Each parent has an obligation to conduct themselves in such a manner as to provide a proper role model for them as they grow to maturity. Each parent has the obligation to seek at all times to be a good influence upon these children.

Another word of caution—neither parent should at any time ever attempt to use these children to "get at" the other one, or to punish the other parent in any way. As did the trial court, this Court cautions both parents that there is yet another alternative which could be pursued if necessary to protect these children and to give them a proper home, which would be totally unsatisfactory to both Mother and Father, that is, the placement of these children in a foster home. This Court hopes that this will never come about. We are concerned about the lives and well-being of these children, first and foremost. Each parent,

both custodial and non-custodial alike, must exert a maximum effort to see that the welfare of these children remains at the center of their attention.

It logically follows that upon this judgment becoming final, and custody being placed with Father, he is relieved from any further payments of child support. The record is silent as to the full visitation rights presently enjoyed by Father. Accordingly, we declare that Mother is entitled to liberal visitation rights with these children. This will call for cooperation between the parties. If this does not work, the trial court of course can establish more rigid guidelines.

The judgment of the court below is reversed. Exclusive custody and control of the parties' two minor children is awarded to Father, with liberal visitation rights in the Mother. Costs in this cause on appeal are taxed to Mother, for which execution may issue if necessary.

CRAWFORD and HIGHERS, JJ., concur.

### ORDER

This cause came on to be duly heard and considered and for the reasons stated in the Opinion of this Court of even date, it is ordered:

1. The judgment of the trial court is reversed. Exclusive custody and control of the parties' two minor children is awarded to Father.

2. Mother is hereby awarded liberal visitation rights.

3. Upon this Order becoming final, Father is relieved of paying any further child support.

4. Costs of this cause are taxed to the Mother, for which execution may issue if necessary.