# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 12, 2001 Session

## JUDY (KENDRICK) SHOEMAKE v. TIMOTHY LEE KENDRICK

### Appeal from the Chancery Court for Hamilton County
### No. 69033     William M. Dender, Judge

### FILED MAY 24, 2001

### No. E2000-01318-COA-R3-CV

In this appeal from the Chancery Court for Hamilton County the Appellant, Judy (Kendrick) Shoemake questions whether the Trial Court erred in granting a petition to modify custody filed by the Appellee, Timothy Lee Kendrick, and whether the Trial Court erred in its determination of the amount due her for child support arrearage and unreimbursed medical expenses paid by her on behalf of the parties' minor children. We reverse in part, modify in part and remand for further proceedings, if any, consistent with this opinion. We adjudge costs of the appeal against Judy (Kendrick) Shoemake and Timothy Lee Kendrick equally.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part and Affirmed in Part as Modified; Cause Remanded

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

Harold Lebron North, Chattanooga, Tennessee, for the Appellant, Judy (Kendrick) Shoemake.

Glenna M. Ramer, Chattanooga, Tennessee, for the Appellee, Timothy Lee Kendrick.

### OPINION

This post divorce proceeding arises from a petition to modify custody filed by Appellee, Timothy Lee Kendrick, ('Father'). Appellant, Judy (Kendrick) Shoemake, ('Mother') appeals the Trial Court's decision and the following issues, which we restate, are presented for our review:

1. Did the Chancery Court err in changing custody of the parties' minor child, Jordan, from Mother to Father?

2. Did the Trial Court err in its determination of the amount of child support arrearage owed by Father to Mother?

3.  Did the Trial Court err in its determination of the amount owed Mother by Father for medical expenses paid by Mother on behalf of the parties' minor children?

Other issues raised by the parties are pretermitted in light of the conclusions set forth herein.

The parties were divorced in the Chancery Court for Hamilton County on October 29, 1990. The divorce decree incorporated a marital dissolution agreement which awarded Mother sole custody of the parties' two minor children, Kelli Faye Hendrick, born November 24, 1981, and Jordan Lee Hendrick, born April 6, 1986. The marital dissolution agreement further provided that Father pay $125.00 per week for child support. On February 23, 1998, Father filed a petition to modify custody wherein he asserted that there had been a "material and substantial change of circumstance" since the divorce which warranted that custody of Kelli and Jordan be transferred from Mother to Father. Based on allegations made in Father's petition, the Trial Court issued an order granting Father temporary custody of the children; however, that order was set aside four days later and the parties were ordered to mediation.

On May 29, 1998, Mother filed an answer and a counter petition to show cause in which she asserted that Father was in arrears in his child support and that he had failed to pay one half of medical expenses incurred by the parties' children not covered by insurance.

On June 23, 1998, after mediation, the Court entered an order submitted by Father which provided that each parent would have equal parenting time with the children and would communicate regarding the children's progress and regarding Jordan's medication. On June 25, 1998, Mother filed a motion to reconsider or set aside the order of June 23 on grounds that Father had unilaterally terminated his child support obligations after mediation, that issues involving child support, custody and visitation were inextricably related and that the Court, knowing of Father's termination of child support, entered the order improperly.

Trial on Father's petition to modify custody and on Mother's counter petition for child support arrearage and medical expenses was held on July 1, 1999. At conclusion of proof, the Trial Court reserved judgment and instructed the parties to attempt to resolve their differences informally. However, the parties were unable to come to an agreement and on May 10, 2000, after a hearing on September 3, 1999, the Court entered its judgment in the case which decreed *inter alia* that custody of Jordan be changed from Mother to Father and that Father pay Mother $6,250.00 child support arrearage and $2,556.42 representing one half of medical expenses incurred by Mother on behalf of the children.

As set forth in Tenn. R. App. P. 13(d), the standard of review in this case is *de novo* upon the record of the proceedings below with a presumption of correctness unless the preponderance of the evidence is otherwise. No such presumption exists as to conclusions of law. *Campbell v. Florida Steel Corporation,* 919 S.W.2d 26 (Tenn.1996).

The first issue we address is whether the Trial Court erred in changing custody of Jordan[1] from Mother to Father.

A decree awarding custody is *res judicata* as to those facts in existence at the time of its entry. See *Griffin v. Stone*, 834 S.W.2d 300 (Tenn. Ct. App.1992). A party seeking to modify a custodial arrangement bears the burden of proving that circumstances affecting the child's welfare have changed in a material way that was not reasonably foreseeable when the original custody decree was entered. See *Long v. Long*, 488 S.W.2d 729 (Tenn. Ct. App. 1972). Furthermore, in acknowledgment of the importance of stability in the life of a child of divorced parents, the courts in Tennessee have ruled that a child's custody should not be disturbed unless there is a strong reason to do so. A court is not justified in changing custody unless the change is necessary to prevent substantial harm to the child. See *Wall v. Wall*, 907 S.W.2d 829 (Tenn. Ct. App. 1995).

We have carefully reviewed the record in this case - specifically, the transcripts of the Trial Court proceedings of July 1, 1999, and September 3, 1999 and the Trial Court's memorandum opinion entered on April, 2000, and its final order entered on May 10, 2000. From our examination of the record it appears to us that the Trial Court concluded that a change of custody was warranted in this case based on the parties' inability to cooperate, the effect of the parties' animosity between one another on Jordan, and the perception that one parent should have absolute authority to make decisions regarding Jordan's welfare. However, there is no indication that the Trial Court ever made a finding that Jordan will suffer 'substantial harm' absent a change of custody and it is, therefore, our duty to make our own finding in that regard. To that end, we review the record *de novo* without a presumption. See *Devorak v. Patterson,* 907 S.W. 2d 815 (Tenn. Ct. App. 1995).

While Father makes reference to various instances of changed circumstances that have occurred since the divorce, we disagree that Jordan will suffer substantial harm as a result of any of these.

First, Father makes reference to the fact that after the divorce until shortly before trial, Mother's work schedule resulted in her being away from home during the evenings and that she was unable to help Jordan with his homework or to spend time with him after school. However, the record shows that Mother's current husband, Sammy Shoemake, assumed these parenting tasks in her absence. Additionally, in May of 1999 Mother began working a different shift which runs from 10:00 p.m. to 7:00 a.m. allowing Mother to be with Jordan when he is not asleep or in school. We find no evidence that Jordan has suffered, or will suffer, substantial harm as a consequence of Mother's work schedule.

Next, Father asserts that Mother's attention to Jordan's education has not been sufficiently aggressive and that she is incapable of meeting his educational needs. Jordan's educational needs are dictated by the fact that Jordan is developmentally delayed and learning impaired and, as a

---

[1]Kelli is no longer a minor and, therefore, her custody is not an issue in this appeal.

consequence, requires an education curriculum commensurate with his abilities and teachers specially qualified to help him. It is clear from the record before us that Father has endeavored to insure that Jordan realizes his maximum educational potential and we commend him for his efforts to provide Jordan with special learning equipment and for his close involvement with Jordan's teachers. However, there is also evidence that Mother has taken an active role in Jordan's education. Both Mother and her current husband testified that they help Jordan with his homework and Mother served as room mother for Jordan's class during the school year preceding trial. Additionally, an educational assistant at Jordan's school testified that the year preceding trial was a good school year for Jordan and that he progressed in his abilities. In summary, we find that both parents are very much concerned with Jordan's educational progress and we find no evidence that Jordan will suffer substantial harm in this respect by reason of Mother's custody.

Father next adverts to the marital relationship between Mother and her current husband, Sammy Shoemake, and asserts that the tumultuous nature of their relationship presents a material change of circumstance since the divorce which justifies a change in custody. It appears to us that whatever tension exists in the marriage of Mother and her current husband is largely precipitated by their interaction with Mr. Shoemake's former wife, Terry Bradley. The record shows that in 1995 Ms. Bradley subpoenaed Mr. Shoemake to court to testify in a post divorce dispute and that Mr. Shoemake stated at the time that he feared it might "cost me my marriage. Now I am out on the street". Ms. Bradley also testified regarding a telephone conversation between her and Mr. Shoemake in the presence of Jordan and Savannah, the daughter of Mother and Mr. Shoemake. Ms Bradley testified that Mr. Shoemake was "screaming" at her and that at one point he told one of the children " to sit down and shut the 'F' up". Mr. Shoemake denies that Jordan was present during this conversation and, although he admits that Savannah was within earshot of the conversation at times, he denies telling her to shut up.

While we do not dispute that there may have been times of tension between Mother and her current husband during the course of their marriage, we find no evidence in the record that such tension has caused substantial harm to Jordan. In fact, witnesses called by Father at trial describe Jordan as "a very happy child" and as "extremely social". Additionally, there is testimony in the record regarding the positive relationship between Mr. Shoemake and Jordan and, specifically, unrefuted testimony from Mr. Shoemake that Father had on several occasions "thanked me for the way I treat his kids". We do not find that the relationship between Mother and her current husband warrants a change of custody in this case.

Additionally, Father contends that continuing custody with Mother poses a substantial risk of harm to Jordan based on an incident involving her decision to have surgery performed to correct Jordan's flat feet. At some time after Father filed his petition to modify custody, Mother consulted with Dr. Miller, a podiatrist whom Mother had consulted in the past regarding her own foot problems and who had performed successful surgery on her feet five years previously. Mother testified that Dr. Miller referred her to Doctor Shaw, a podiatrist practicing Atlanta, Georgia, who he felt was more experienced in taking care of patients like Jordan. Mother scheduled surgery with Dr. Shaw. Mother did not consult Father in making the decision to schedule surgery and Father first learned

of the surgery in a conversation with Kelli. After consulting with a physician friend, Dr. Christine Parker, Father contacted Mr. Shoemake and voiced his concern that a podiatrist rather than a surgeon would be operating on Jordan's feet and informed Mr. Shoemake that he wanted a second opinion. According to Father's testimony, Mr. Shoemake responded that the surgery would proceed as scheduled. Thereafter, Father caused a temporary restraining order to be issued enjoining the surgery.

Father argues that Mother's determination to proceed with the surgery on Jordan's feet without consulting him, and in spite of his concerns, demonstrates poor judgment with respect to Jordan's medical care. We disagree.

Father states in an affidavit supporting his motion for issuance of the temporary restraining order that he was advised by Dr. Parker that "a podiatrist is not qualified to perform this type of surgery" and that Jordan would be "crippled for life if the surgery is not successful"

In her testimony at trial, Dr. Parker did not state that a podiatrist would not have been qualified to perform the contemplated surgery. Rather, her concern was that there was no one in her vicinity who she could call to verify his qualifications. Dr. Parker also testified that she did not even know what kind of surgery was to be performed other than that it was foot surgery for flat feet. In view of her admitted ignorance regarding the nature of the surgery, we question whether Dr. Parker would have had adequate information to form an opinion as to consequences were the surgery to be performed unsuccessfully. While we acknowledge that any foot surgery performed with sufficient negligence could cause crippling damage, we find nothing in the record to suggest that Dr. Shaw was not qualified to perform the surgery in question or that the surgery would not have been successful had he performed it.

Dr. Parker further testified as to her view regarding the importance of obtaining a second opinion before proceeding to surgery:

> So I don't think it was really what the final answer was going to be, it was the process of getting somebody who did not have financial interest in doing the surgery and having someone with extensive expertise in foot surgery.

While we would strongly encourage Mother to always seek a second opinion before making a decision regarding surgery, we do not find that evidence in this case shows that Jordan would have suffered substantial harm because she failed to do so.

We would hope that Mother and Father would set aside their personal differences long enough to make decisions regarding Jordan's medical treatment; however, the marital dissolution agreement which both parties signed and which is incorporated into the divorce decree in this case gave Mother "sole and exclusive care, custody and control" of the parties' minor children and, accordingly, it was within her discretion not to consult with Father in making the decision she made regarding surgery. Finally, Mother's unrefuted testimony shows that she is generally attentive to

Jordan's medical needs and that, at the time of trial, she was taking Jordan to an allergist on a weekly basis and to an orthodontist every four to six weeks and that she has taken him to a pediatric neurologist on many occasions and to a physical therapist for many years. It is our conclusion that Father has failed to demonstrate that Mother's medical care of Jordan and decisions which she makes in that regard will cause him substantial harm.

Finally, in support of his argument for a change of custody, Father references Mother's decision to place a letter in the local newspaper in which she, *inter alia,* accused Father's current wife, who was a candidate for circuit court judge at the time, of exploiting Jordan and Kelli for purposes of her campaign and of taking Jordan and Kelli away from her in violation of Tennessee law. In the letter Mother also alleges that Father is $2,700.00 behind in child support. Kelli had previously requested that Mother not write this letter and Father argues that Mother showed a total disregard for Kelli's emotional well-being by doing so and that she thereby demonstrated that she is incapable of subordinating her own needs to meet the needs of her children.

Although we agree that Mother's decision to expose her family's problems to the public in view of the predictable distress and embarrassment it would cause Kelli exhibited poor judgment, we do not find that this incident represents a general tendency on the part of Mother to subordinate her children's needs to her own. Specifically, we find that the evidence does not preponderate in favor of such a finding with respect to Jordan whose custody is at issue in this case.

In summary, it is our conclusion that Father has failed to show that Jordan will suffer substantial harm if he remains in the custody of Mother and, therefore, we hold that the Trial Court committed error by changing custody of Jordan from Mother to Father.

The next issue we address in this case concerns whether the Trial Court erred in its determination of the amount of child support arrearage owed in this case.

Pursuant to the marital dissolution agreement entered into by the parties on October 29, 1990, Father was obligated to pay mother $125.00 per week for the support of Jordan and Kelli. However, in February of 1998, Father unilaterally discontinued paying child support after entering into a mediated agreement with Mother which divided parenting time with the children equally between the parties. The Trial Court accepted this parenting time agreement at a hearing on February 27, 1998. The subject of child support was not addressed during these proceedings. Subsequently, in July of 1998, Kelli began living with Father on a full time basis and continued to do so during the remainder of her minority.

In its order of May 10, 1999, the Trial Court decreed that, with respect to Jordan, Father should pay all child support arrearage in the amount of $62.50 per week from February 27, 1998, until September 3, 1999, the date when the Trial Court ruled that custody of Jordan should be changed from Mother to Father. With respect to Kelli, the Trial Court ordered Father to pay child support arrearage in the amount of $62.50 per week from February 27, 1998, until, July 15, 1998, the date when Kelli began living with Father on a full time basis.

Mother contends that the Trial Court's ruling constituted a retroactive modification of child support, that this is prohibited by statute in Tennessee and that Father should be required to pay child support on both children for the full period from February 27, 1998 to September 3, 1999. Father maintains that he should have been relieved of paying child support for Kelli from the time she began living with him and that both parties should have been relieved from paying child support for Jordan as of February 28,1998, since Jordan was spending equal time with each parent after that date. Father also argues that the Trial Court should have required Mother to pay him child support for Kelli from the time she began living with him on a full time basis continuing until she turned eighteen or graduated from high school, whichever event occurred later.

The statutory law in Tennessee is quite clear in prohibiting retroactive modification of court ordered child support obligations. T.C.A. 36-5-101(a)(5) states in pertinent part with regard to a judgment for child support as follows:

> Such judgment shall not be subject to modification as to any time period or any amounts due prior to the date that an action for modification is filed and notice of the action has been mailed to the last known address of the opposing parties.

Father never filed an action for modification of child support in this case; however, Father argues that the case *sub judice* is analogous to *Duckett v. Duckett*, an unreported opinion of this Court, filed in Knoxville on February 13, 1996. In the *Duckett* case the father filed his petition to change custody on August 2, 1994 and, after a hearing on the custody issue as well as other issues presented, the lower court entered an order on November 22, 1994. However, our review of the lower court's order in that case revealed that it did not dispose of the custody issue and we were, otherwise, unable to determine the lower court's intention as to the requested change of custody. Accordingly, this Court made its own finding in *Duckett* and ordered that custody be changed to the father effective August 2, 1994, the date of the father's petition and that the father be relieved of his child support obligation as of that date.

Father argues that, like the father in *Duckett* he should be relieved of his child support obligation as of the date of his petition to modify custody. However, in *Duckett,* pursuant to our ruling, the change of custody to the father was made effective from the date of the father's petition in the absence of a lower court ruling. In the case *sub judice* the Trial Court did rule with respect to the change of custody and such ruling was not effective until September 3, 1999[2]. Thus, Father remained the non-custodial parent until that date and his obligation to pay child support remained unchanged.

---

[2]Although Father was granted temporary custody of the children by order entered February 23, 1998, this order was set aside on February 27, 1998.

While we conclude that Father's child support obligations should not have been modified in this case, we also determine that the law provides that Father should be allowed credit for necessaries that he has provided Jordan and Kelli when those necessaries were not being provided by Mother. See *Netherton v. Netherton*, an unreported opinion of this Court filed in Nashville on February 26, 1993. Mother testified that, between February 28, 1998, and September 3, 1999, she continued to supply certain of the children's necessaries- specifically, school tuition and supplies and clothing. At trial, Father testified that, during this period, he also made payments for the children's clothing, Kelli's school tuition and everyday living expenses. As an exhibit to his testimony, Father filed lists which he asserts to be itemizations of such payments. These lists contain dates, names of payees and amounts paid, however, as a general matter, the items or services purchased are not specifically identified and it is, therefore, not possible to discern which of these expenditures were for necessaries.

Recognizing that Father most likely expended funds on the children while they were in his care, at least to the extent of providing them with food and shelter, we remand this case to the Trial Court with instructions to conduct a hearing to determine the amount of expenditures made by Father on behalf of the children for necessaries not provided by Mother between February 28,1998, and September 3, 1999. The Court is further instructed to allow Father a credit for such expenditures against the total child support arrearage he owes Mother. If it is not possible to determine the exact amount of such expenditures the Court is instructed to allow Father a pro rata credit for necessaries he provided the children based on the amount of time they were in his care.

The final issue raised in this appeal concerns whether the Trial Court erred in determining the amount owed to Mother by Father for medical expenses paid by Mother on behalf of Jordan and Kelli.

Mother submitted evidence at trial that she had paid medical expenses on behalf of the children in the amount of $7,074.00 and that Father had not paid one-half of this amount as he was required to do pursuant to the divorce decree of October 29, 1990. At the September 3, 1999, hearing the Trial Court confirmed that Mother would have a judgment against Father for unpaid medical expenses in the amount of $3,537.20, subject to reconsideration upon presentation of proof by Father that Mother's payments were, in fact, not made. Thereafter, instead of presenting proof that the payments were not made , Father filed an affidavit with supporting documentation asserting that he had paid other additional medical expenses on behalf of the children totaling $2,052.75.

In its memorandum opinion of April 17, 2000, the Trial Court found that total medical expenses for both children amounted to $9,035.96 and that each party should have paid one-half of this amount or $4,517.98. The Court further found that Father had shown that he had made payments totaling $1,961.56 leaving a balance owed by him of $2,556.42. Although the details of the Trial Court's calculations are not set forth in the record, it appears that the Court determined from the proof offered by Father that he made all payments asserted with the exception of a $50.00 payment to Dr. Chien on February 22, 1991, and a payment of $41.19 to CVS/Revco, it appearing from records provided by Mother that both of these expenses were paid in full by her insurer.

Apparently, the Court then added the remaining payments of $1,961.56 to the total payments made by Mother and arrived at a grand total of $9,035.96. Each party was required to pay one-half of this amount, or $4,517.98, which resulted in Father finally owing $2,556.42 after receiving credit for the $1,961.56 he had previously paid.

Mother contends that the Trial Court erred by allowing Father to submit payments made by him when the Court had announced that it would grant her a judgment of $3,537.20 subject only to proof by Father that payments asserted by her had not been made. We disagree.

It is well settled in Tennessee that a court speaks only through judgments which have been reduced to writing and duly entered. An oral announcement alone is not of any effect. See *Sparkle Laundry & Cleaners, Inc.*, 595 S.W.2d 88 (Tenn. Ct. App. 1979). Thus, the Trial Court was not bound by its announcement regarding the conditions of its judgment. Furthermore, it is also well settled that the admissibility of evidence is within the sound discretion of the trial judge and a trial court is awarded a wide degree of discretion in determining whether to admit evidence. See *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439 (Tenn. 1992).

Our review of the record convinces us that the Trial Court did not abuse its discretion in considering the evidence submitted by Father as to payment of medical expenses nor do we find that the evidence preponderates against the Trial Court's findings with respect to the amount of payments owed by Father with the following exception. Mother acknowledges in her brief that, of the total amount of medical expenses submitted by her to the Trial Court, $645.30 represented expenses actually incurred before the parties divorced. Accordingly, we reduce the Trial Court's judgment against Father by one-half of this amount or $322.65 which leaves Father owing Mother $2,233.77.

For the foregoing reasons, the judgment of the Trial Court is reversed in part, affirmed in part as modified and remanded for further proceedings consistent with this opinion and for collection of costs below which are, as are costs of appeal, adjudged against Judy (Kendrick) Shoemake and Timothy Lee Kendrick equally.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE