IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 30, 2001 Session

## ANNA M. WILLIAMS v. JAMES K. WILLIAMS, II

**Appeal from the General Sessions Court for Blount County**
**No. S-3817     William R. Brewer, Jr., Judge**

### FILED MAY 8, 2001

### No. E2000-03005-COA-R3-CV

In this post-divorce case, Anna M. Williams ("Mother") filed a petition against James K. Williams, II ("Father"), seeking a modification of the parties' divorce judgment, which judgment, *inter alia*, had awarded the parties joint custody of their minor daughter, Ashlyn Brooke Williams (DOB: July 20, 1996). The petition sought an alteration of Father's visitation schedule and an increase in Father's child support obligation. In response, Father filed, *inter alia*, a petition for change of custody. The trial court found a substantial and material change in circumstances and awarded Father sole custody of Ashlyn. We reverse.

**Tenn. R. App. P. 3; Judgment of the General Sessions Court**
**Reversed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

R. Deno Cole, Knoxville, Tennessee, for the appellant, Anna M. Williams.

David M. Boyd, Maryville, Tennessee, for the appellee, James K. Williams, II.

### OPINION

I.

Mother and Father were divorced on January 28, 1999. They were awarded joint custody of their daughter, Ashlyn. Pursuant to the Marital Dissolution Agreement incorporated by reference into the judgment of divorce, Mother was designated the primary residential custodian. Father was granted reasonable and liberal visitation consisting of at least three days of overnight visitation per week. He was ordered to pay $440 per month in child support.

At the time of the parties' divorce, Mother and Ashlyn were living with one of Mother's friends. The parties had agreed that Father would have overnight visitation on Wednesday, Friday,

and Saturday of each week, nights when Mother was working at Cotton Eyed Joe, a dance club in West Knox County.

Mother began dating David Rider in February, 1999. In April or May of 1999, Mother and Ashlyn moved back into Father's two-bedroom, single-wide trailer. Despite this living arrangement, Mother continued to date Rider.

In April, 1999, Mother enrolled as a student at the Hair Academy in Knoxville. From April, 1999, until she quit her job at Cotton Eyed Joe in September, 1999, Mother had what she termed a "very hectic" schedule. She attended school from Tuesday to Saturday from 9:00 a.m. until 3:00 p.m. On Wednesdays, Fridays, and Saturdays, she would go straight from school to her employment at Cotton Eyed Joe, where she would work until between 1:30 a.m. and 3:30 a.m. She testified that during this time, Ashlyn was with Mother's grandmother during most of the time the child would otherwise have been with Mother. At least on some of the nights Mother worked late, she spent the night with Rider, who lived five minutes from Cotton Eyed Joe.

September, 1999, was a period of change for the parties. Mother quit her employment at Cotton Eyed Joe and took a job at Ron Hall Salon. Her new position allowed her to have Ashlyn every night except for the Wednesday, Friday, and Saturday nights Ashlyn spent with Father. Mother also became pregnant with Rider's child during this time. The relationship between Mother and Father began to deteriorate, and Mother initiated plans to move out of Father's residence. In November, 1999, she moved to a housing project in Lenoir City.

After Mother moved out, the parties could not come to an agreement over whether Father should be allowed to maintain his Wednesday, Friday, and Saturday evening visitation schedule. Mother consequently filed her petition for modification, alleging that there had been a material change of circumstances. She also sought an increase in child support based upon a "significant variance" due to Father's allegedly increased wages. At the hearing, she testified that she filed this petition because Ashlyn "went from being a happy, well-adjusted child, affectionate child, to being just angry and aggressive." Father responded by filing, *inter alia*, an answer to Mother's petition denying that a material change in circumstances had occurred, and, on the same day, a petition for change of custody, alleging that there had been a material change of circumstances.

A hearing was held on August 22, 2000. As pertinent to the primary issue before us, the evidence presented at trial related to (1) the parties' employment; (2) the contributions of the parties' relatives to Ashlyn's care; (3) Mother's new residence; (4) Mother's boyfriend and their son; and (5) the effect on Ashlyn of the foregoing.

## A.

Mother graduated from cosmetology school in February, 2000, with a certificate in cosmetology, and, at the time of the hearing, was working four days per week at Ron Hall Salon. She was scheduled to take her state board examination a few days after the hearing below. In addition to her wages, she received $440 per month in child support from Father, and $520 per month in child support from Rider.

Father works as a supervisor at TRW Koyo Steering Systems, Inc., in Vonore. Father's shift varied; he rotated through day shifts, second shifts, and third shifts.

## B.

The testimony indicates that both parties' extended families assisted in caring for Ashlyn. During the time Mother was both working and going to school, *i.e.*, from April, 1999, until September, 1999, Mother's grandmother cared for Ashlyn four days a week.

Father's mother also assisted in caring for Ashlyn. When Father worked the second or third shift, Ashlyn slept at the home of her paternal grandmother at least two nights per week. On these days, he and Ashlyn generally would go to his mother's house at about 6:30 p.m. and spend time together until Father had to leave for work at approximately 9:00 p.m., at which time his mother put Ashlyn to bed. When Father came home the next day, his mother cared for Ashlyn while Father slept until approximately 12:30 p.m., at which time Father would spend time with Ashlyn until it was time for Ashlyn to return to Mother.

## C.

When Mother moved out of Father's trailer in September, 1999, she moved to a housing project in Lenoir City. Apart from Father testifying that he did not like what he had "heard" about the project, the only testimony relating to the safety of Mother's new home seems to support the idea that the neighborhood did not present a dangerous environment.

## D.

Mother began dating Rider in February, 1999. She conceived a child with him in September, 1999, and they had a son in May or June, 2000. They became engaged in January, 2000. Mother testified that she planned to marry Rider "[p]robably next year," and that she does not "feel like" she has to be married at this time.

Mother, with Ashlyn, has spent the night at Rider's home on several occasions. Mother testified that she and Ashlyn had stayed with Rider due to electrical problems at her apartment. Mother and Rider testified that Mother and Ashlyn sleep in a separate area of the house when they stay with Rider. Mother testified that she sees nothing wrong with her and Ashlyn sleeping at

Rider's because they sleep in a separate room, and that she has no problem with having a child out of wedlock because she and Rider intend to marry.

E.

The testimony indicates that Ashlyn experienced no unusual problems prior to September, 1999. In September, 1999, however, when Mother became pregnant and moved out of Father's trailer, Ashlyn began to misbehave, particularly during the transition from Father to Mother. She would kick, hit, scream, and cry, desiring to stay with Father rather than go with Mother. Throughout this period, Ashlyn was always happy to see Father and behaved better for him.

Mother's explanation for this misbehavior is, based on a statement Ashlyn had made to her, that Father and the child's paternal grandmother were telling Ashlyn that Mother did not love her because Mother had a new boyfriend and baby. Mother subsequently sought the assistance of a psychiatrist, Dr. Arvell S. Luttrell, because "[Ashlyn] was still having some issues with the anger, she – me and her, our relationship was poor, to say the least. She was angry with me for no apparent reason."

Dr. Luttrell first treated Ashlyn on March, 20, 2000. He initially diagnosed Ashlyn as having separation anxiety disorder. He found that Ashlyn "went through a period of considerable hostility toward the baby and was acting out," but that that situation "seem[ed] to have smoothed over." Mother testified that, at the time of the hearing, Ashlyn was getting along better with her little brother, but that she still showed excessive aggression when she returned from visitation.

After April 17, 2000, Dr. Luttrell began to focus on Mother and Father rather than on Ashlyn. With respect to Mother, Dr. Luttrell found that Mother's parenting skills were "kind of low," and that he "[had] to take seriously" Father's assertions that Mother has a short temper, but he would not characterize her as a bad parent. He stated that he thought that moving from place to place would generally undermine the goal of stability, but opined that Ashlyn had suffered no such harm. He viewed Mother's engagement to Rider as a positive for Ashlyn, and stated that he did not think having a baby out of wedlock would affect Ashlyn's moral upbringing in this day and age. Moreover, he stated that Mother had improved during the course of treatment, gaining more stability and better self-esteem.

With respect to Father, Dr. Luttrell found that he did not seem to want to cooperate with Mother and that he was too adamant about the idea of having sole custody of Ashlyn. In contrast to his observations concerning the relationship between Mother and Ashlyn, he stated that the relationship between Father and Ashlyn appeared "rather warm."

Dr. Luttrell found that Ashlyn was in no danger, but opined that she should be kept in the most stable situation possible. He recommended that custody remain joint and that the parties should enjoy equal visitation. Finally, he recommended that, in order to reduce multiple transitions between

households, Mother should care for Ashlyn during the week and Father during the weekend, and that the time should be equalized over the summer.

F.

The trial court, interpreting Dr. Luttrell's opinion "to be that the child needs stability and constancy in her life," found there to be "a substantial and material change of circumstances wherein it is now in the best interest of the minor child that legal custody be placed with [Father]."

II.

In this non-jury case, our review of the trial court's factual findings is *de novo*; however, the case comes to us accompanied by a presumption that those findings are correct – a presumption we must honor unless the evidence preponderates against the trial court's factual findings. Tenn. R. App. P. 13(d); *Musselman v. Acuff*, 826 S.W.2d 920, 922 (Tenn. Ct. App. 1991). Our search for the preponderance of the evidence is tempered by the principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such determinations are entitled to great weight on appeal. *Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991).

III.

A.

An initial award of custody is "subject to such changes or modification as the exigencies of the case may require." T.C.A. § 36-6-101(a)(1) (Supp. 2000). This court has noted that the initial judgment awarding custody "is *res judicata* and is conclusive in a subsequent application to change custody unless some new fact has occurred which has altered the circumstances in a material way so that the welfare of the child requires a change of custody." *Griffin v. Stone*, 834 S.W.2d 300, 301-02 (Tenn. Ct. App. 1992). Thus, the crucial question is whether there has been a "material change" warranting a change of custody. *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999) (*perm. app. denied* May 15, 2000). A "material change" is one that "requires a change to prevent substantial harm to the child." *Wall v. Wall*, 907 S.W.2d 829, 834 (Tenn. Ct. App. 1995). To constitute a material change of circumstances warranting modification of a custody decree, a change "must occur after the entry of the order sought to be modified and the change cannot be one that was known or reasonably anticipated when the order was entered." *Hoalcraft*, 19 S.W.3d at 829.

A trial court has broad discretion in determining matters of custody, *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999), and "we will not tamper with that discretion unless the facts demonstrate that the trier of fact has abused his or her discretion." *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App.1997). Such determinations are factually driven and involve consideration of several factors. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). The

best interest of the child is the paramount consideration, *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988); *Musselman*, 826 S.W.2d at 922, and the decision is not to be made to reward or to punish either parent. *Adelsperger*, 970 S.W.2d at 485. The burden to prove a material change in circumstances lies upon the party seeking a modification of the prior decree. *Hoalcraft*, 19 S.W.3d at 830.

Mother argues that the trial court erred in conducting a comparative fitness analysis without first making a specific finding of a material change amounting to substantial harm to the child. She asserts that the trial court, in drastically modifying the custody decree from joint custody with liberal visitation rights for Father to sole custody to Father and mere "Standing Order" visitation to Mother, amounts to an impermissible punishment of Mother.

We agree that the trial court erred in modifying the then-existing custodial arrangement. The trial court, in its memorandum opinion, stated that

> the most stable environment currently available for the child is for primary legal custody to be placed with [Father], for the aforesaid reasons and the factors to be considered as set out in the Code. The Court, therefore, finds that there has been a substantial and material change of circumstances wherein it is now in the best interest of the minor child that legal custody be placed with [Father. Mother] shall have visitation per the Standing Orders of the Court. [Mother] owes a duty of child support consistent with the current Child Support Guidelines. Should the parties be unable to agree on that amount, the Court will hear further proof and decide the amount of child support owed by [Mother.][1]

The "aforesaid reasons" consist primarily of a recitation of the facts in substantially the same manner as we have communicated them in the opening of this opinion.

On appeal, Father asserts that the following circumstances constitute a material change sufficient to warrant a change of custody: (1) Mother moving into the housing project; (2) Mother having a child out of wedlock; and (3) Mother and Ashlyn temporarily living with Rider.

---

[1]Visitation under the Standing Order of the Courts is

> each alternate weekend, beginning on the second weekend following the filing of the divorce complaint from Friday at 6:00 p.m. through Sunday at 6:00 p.m.; Easter in the even years; Thanksgiving in the odd years from Wednesday at 6:00 p.m. through Sunday at 6:00 p.m.; the first two (2) weeks in July; two (2) hours on the child or children's birthday(s); during Christmas holidays from 12:00 Noon on Christmas Day through 6:00 p.. [sic] on January 1.

We agree with Mother that the record does not support a finding that the circumstances have changed such that custody must be modified to prevent substantial harm to Ashlyn. With respect to Mother's new residence, the only evidence suggesting it might potentially be dangerous is that Father did not like what he had "heard" about the complex. This is hardly credible evidence. Opposed to Father's "testimony" are several statements from Mother, Mother's grandmother, and Mother's boyfriend that they had never witnessed anything unsafe or inappropriate at the location.

Regarding Mother having a child out of wedlock and Mother and Ashlyn staying overnight at Rider's home on several occasions because of problems at Mother's residence, we are of the opinion that these facts, by themselves, do not justify a finding of the requisite material change of circumstances. There is no proof in the record that Ashlyn was exposed to any improper conduct when she and Mother stayed overnight at Rider's house. This proof reflects that they – being Mother and Ashlyn – slept in a separate room from that of Rider. Furthermore, with respect to having a child out of wedlock, "the sexual behavior of the mother is not a ground for change of custody absent a showing that the behavior had an adverse impact on the child's welfare." *Musselman*, 826 S.W.2d at 923.

It is clear that the facts presented to the trial court are different from those existing at the time of the divorce; but what is missing in this case is proof that the changes that have occurred are such as to "require[] a change [in custody] *to prevent substantial harm to the child.*" *Wall*, 907 S.W.2d at 834 (emphasis added). Ashley's acting-out is easily explained by the arrival of her half-brother. This is not uncommon; furthermore, this situation seems to be improving. Certainly, there is no proof in this record that Ashley's acting-out is related to, or caused by, any improper conduct on the part of Mother. By the same token, there is no credible proof that Mother has engaged in conduct in front of the child that was reasonably calculated to cause the child substantial harm. If custody is changed with no proof of new facts that have resulted in substantial harm to a child or no proof of changes in the factual pattern such as are reasonably calculated to cause such harm, there is a danger that the change of custody can be interpreted as an attempt to punish the custodian for his or her conduct.[2] This a court cannot do. *Long v. Long*, 488 S.W.2d 729, 733 (Tenn. Ct. App. 1972).

Dr. Luttrell found that, though Ashlyn "went through a period of considerable hostility toward the baby and was acting out," that situation "seem[ed] to have smoothed over." Though he opined that Mother's parenting skills were "kind of low," he specifically would not say that she was a bad parent. Furthermore, there is no proof before us that Mother's parenting skills or her temper had changed since the divorce. Dr. Luttrell viewed Mother's engagement to Rider as a positive for Ashlyn, and stated that he did not think having a baby out of wedlock would affect Ashlyn's moral upbringing in this day and age. Most importantly, he opined that Ashlyn was in no danger.

When considered as a whole, the evidence preponderates against the trial court's finding of the requisite material change in circumstances warranting a change in custody. There is nothing to

---

[2]In the course of its memorandum opinion, the trial court observed that it "ha[d] a problem with [Mother's] living arrangement," apparently referring to the times that Mother and Ashlyn stayed at Rider's residence.

suggest that any of the complained-of behavior or circumstances pose a threat of danger to Ashlyn. Because we find that the trial court erred in finding a sufficient material change in circumstances, it follows that the trial court erred in engaging in a comparative fitness analysis. *See **Caudill v. Foley***, 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999) (stating that courts must, before proceeding with a best interest analysis, "first determine whether there has been a material change in circumstances arising subsequent to the initial decree awarding custody such that the welfare of the child demands a redetermination of custody") (*perm. app. denied* April 17, 2000); ***Placencia v. Placencia***, 3 S.W.3d 497, 499 (Tenn. Ct. App. 1999) ("Absent a material change in circumstances…the petition to modify custody must be denied.") (*perm. app. denied* September 13, 1999). Accordingly, we hold that the trial court erred in modifying the initial custody decree.

B.

Mother's next argument is based on the contingency that we agree with the trial court that there has been a material change of circumstances warranting a change of custody to one party or the other. Because we find that the trial court erred in so finding a material change of circumstances, this issue is pretermitted.

C.

Mother raises an additional argument relating to the amount of Father's child support award. This issue was not addressed by the trial court in its memorandum opinion or its order, obviously because the court had awarded Father custody of the child. We direct the trial court to consider and determine this issue on remand.

IV.

The judgment of the trial court is reversed. This case is remanded for the entry of an order reinstating joint custody with primary residential custody in Mother, subject to Father's visitation rights as set forth in the trial court's Standing Order,[3] and for consideration of Mother's request for a modification of the child support award established at the time of the divorce. Costs on appeal are taxed to the appellee.

_____
CHARLES D. SUSANO, JR., JUDGE

---

[3]We recognize that our opinion works a change in Father's visitation with Ashlyn. We do this because the visitation schedule established in the judgment of divorce was driven, at least in substantial part, by Mother's then-school and work schedule. Since her schedule has changed, we find that the trial court's Standing Order of visitation is more appropriate. It is also more in keeping with Father's shift work.