IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 8, 2010 Session

## JOSEPH PATRICK HYDE  v.  AMANDA BRADLEY

**Direct Appeal from the Juvenile Court for Sumner County**
**No. 81-188      Barry R. Brown, Judge**

_____

**No. M2009-02117-COA-R3-CV - Filed October 12, 2010**

_____

This is an appeal from the trial court's denial of Father/Appellant's petition to be named the minor child's primary residential parent or, in the alternative, to increase his parenting time. The trial court denied Father's petition, and also denied Father an award of attorney's fees and costs under Tenn. Code Ann. § 36-5-103(c).  Finding that Father failed to meet his burden to show a material change in circumstances sufficient to warrant a change in the child's primary residential parent and/or the child's residential schedule, and that the trial court did not abuse its discretion in denying attorney's fees and costs, we affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Mark T. Freeman, Nashville, Tennessee, for the appellant, Joseph Patrick Hyde.

James B. Hawkins and Randy Lucas, Gallatin, Tennessee, for the appellee, Amanda Bradley.

**OPINION**

On December 17, 2005, the minor child at issue in this case was born to the Appellee, Amanda Bradley.  Ms. Bradley was not married to the child's father, Appellant Joseph Patrick Hyde.  The State of Tennessee, *ex rel*. Amanda Bradley provided Title IV-D support for the child, and, consequently, filed a petition to establish paternity.  Genetic testing established that Mr. Hyde was the biological father, and in December, 2006, the trial court

adjudicated Mr. Hyde to be the child's father.[1]

On May 2, 2007, Ms. Bradley and Mr. Hyde appeared before the Sumner County Juvenile Court and announced that they had entered into an agreed parenting plan. The Court found that the parties had agreed, and entered an order on June 1, 2007. Pursuant to the parties' agreement, the court ordered that Ms. Bradley would be the primary residential parent, and that Mr. Hyde would enjoy time with the child pursuant to the residential schedule entered by the court.[2]

---

[1] The order adjudicating Mr. Hyde to be the child's biological father is not contained in the appellate record.

[2] We note that Father submitted his brief and appeal using the terms of "custody" and "visitation." As recently explained by this Court:

> These terms, while not entirely obsolete, are outmoded when considering a determination of parental responsibility under the parenting plan statute, Tennessee Code Annotated section 36-6-401 et seq., which was adopted in part to change the language of child custody decisions. See Janet Leach Richards, Richards on Tennessee Family Law, § 8-2(e) (3d ed.2008) (footnotes omitted). Judge Don. R. Ash, one of the leading proponents of reform, explained the need to recast the terminology of these decisions: "The archaic terms 'custody' and 'visitation' convey ownership over the child and imply that one party is merely a visitor in the home. These terms should be replaced with more user-friendly words." Judge Don R. Ash, Bridge Over Trouble Water: Changing the Custody Law in Tennessee, 27 U. Mem. L. Rev. 769, 801 (2007) (footnote omitted). The parenting plan statute did just that, replacing the traditional concepts of joint legal and physical custody with a new concept: the residential parenting schedule. 19A W. Walton Garrett, Tennessee Practice Series: Tennessee Divorce, Alimony and Child Custody § 26:3, at 78 (2d rev. ed.2007). As a result, traditional terms such as custody, visitation, custodial parent, and noncustodial parent have given way to new terms, e.g., "residential schedule, temporary and permanent parenting plans, primary residential parent, alternate residential parent, and parenting responsibilities." Richards, supra, at § 8-2(e) (footnotes omitted). Because this change was intended to inspire parties to move beyond the win-lose mentality present in previous disputes over parental responsibility, see id., we find it appropriate to re-frame [Father's] argument in these terms. We note, however, that the change of terminology does not necessarily undermine the reasoning of previous opinions deciding custody and visitation disputes where the same concerns-supporting parent-child relationships, providing a mechanism for decision-making, allocating time with the child, promoting the child's best interests-predominated our review.

(continued...)

On October 19, 2007, Mr. Hyde filed a petition for contempt against Ms. Bradley, and appeared *pro se* at the November 19, 2007 hearing on the petition. Following that hearing, the court found that Ms. Bradley was in willful contempt for failing to adhere to the residential schedule, as established by the June 1, 2007 order, *supra*. Ms. Bradley was ordered to pay Mr. Hyde $250.00 in attorney fees, as well as the court costs.

On October 7, 2008, Mr. Hyde filed a second petition for contempt against Ms. Bradley, and also petitioned the court to make Mr. Hyde the primary residential parent or, in the alternative, to modify the current parenting plan to allow Mr. Hyde more time with the child. Specifically, Mr. Hyde asked the court to find Ms. Bradley in civil and criminal contempt, and asked the court to "deem [Mr. Hyde] the primary residential parent of the minor child" on alleged grounds that Ms. Bradley had engaged in "intentional and malicious act[s] of contempt...in her effort to keep...the child from [Mr. Hyde]." It is important to note that Mr. Hyde's petition does not state that modification of the child's residential parent or schedule would be in the child's best interests. In fact, from his petition, it appears that Mr. Hyde's sole basis for seeking modification of the parenting arrangement is Ms. Bradley's alleged contempt in failing to comply with the previous order of the court. On November 13, 2008, Ms. Bradley filed an answer to Mr. Hyde's petition, wherein she specifically denied the allegations that she had violated the court's order and had willfully kept the child from Mr. Hyde. In addition to denying the material allegations of Mr. Hyde's petition, Ms. Bradley also averred that Mr. Hyde had:

> repeatedly refused to obey the Court's Order regarding pickup time of the child...despite [Ms. Bradley's] efforts to work with [Mr. Hyde, he] refuses to pick up the child on time for his parenting time[,] and is usually between 30 minutes and an hour late in picking up the child or doesn't show up at all.

An initial hearing was held on November 19, 2008. At that time, the parties informed the court that they had reached an agreement to modify the child's residential schedule temporarily to allow certain visitation during the holiday season. On November 28, 2008, the court entered an interim order, allowing the parties' holiday parenting schedule, but indicating that the regular schedule would resume on January 9, 2009. The court also set a

---

[2](...continued)
*In re Emma E.*, No. M2008-02212-COA-R3-JV, 2010 WL 565630 at n. 2 (Tenn. Ct. App. Feb. 17, 2010).

We also note that remnants of the "old" terminology remains in the Code as demonstrated by the use of the term "custody" in Tenn. Code Ann. § 36-6-101(a)(2)(B).

date for the hearing on Mr. Hyde's petition for permanent modification of the child's residential schedule.

The hearing on Mr. Hyde's petition began on February 19, 2009. Following this hearing, the court ordered both parties to attend parenting classes "within a six-month period" from February 19, 2009. The court then set a court date of July 23, 2009 to review the matter. An order was entered on April 29, 2009, which indicates that the court "chooses not to make a permanent ruling in this matter but rather to reset this matter for follow up hearing." The order also correctly notes that "both parties have the right to know and participate in the child's life."

At the review hearing on July 23, 2009, both parties provided proof that they had attended a parenting class as directed by the court. Following that hearing, the court entered its order on September 10, 2009. From our reading, it appears that the court did not make substantive changes in the original parenting arrangement; rather, the court's order clarifies issues concerning Mother's Day, Father's Day, holidays, and summer vacation, including applicable pick up and drop off times. In addition, Mr. Hyde was granted two non-consecutive weeks with the child during the summer. The court further ordered that Ms. Bradley would pay Mr. Hyde's attorney's fees. The amount of the attorney's fees was reserved, pending submission of Mr. Hyde's attorney's affidavit of fees. Following submission of this information, on September 10, 2009, the court entered an order indicating that, after review of the affidavit of fees, Ms. Bradley "should be responsible for $0 in attorney's fees and $0 in discretionary fees."

Mr. Hyde appeals, rasing two issues for review, as stated in his brief:

> 1. Whether the trial court erred in failing to modify the parenting time in favor or Mr. Hyde.

> 2. Whether the trial court erred in failing to award attorney's fees and discretionary costs to Mr. Hyde.

We review the trial court's conclusions of law under a *de novo* standard, with no deference to the conclusions made by the lower court. ***Kendrick v. Shoemake***, 90 S.W.3d 566, 569-70 (Tenn. 2002); ***Southern Constructors, Inc. v. Loudon County Bd. Of Educ.***, 58 S.W.3d 706, 710 (Tenn. 2001). A "review of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); ***Kendrick***, 90 S.W.3d at 570.

In applying the *de novo* standard, "we are mindful that '[t]rial courts are vested with wide discretion in matters of child custody' and that 'the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion.'" **Johnson v. Johnson**, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004) (quoting **Koch v. Koch**, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993)). "Because '[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during ... proceedings themselves,' appellate courts 'are reluctant to second-guess a trial court's decisions.'" **Johnson**, 169 S.W.3d at 645 (quoting **Gaskill v. Gaskill**, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1993)).

## Change of Primary Residential Parent and/or Modification of the Child's Residential Schedule

In these cases, the law is well settled that, when a decree concerning a child's primary residential parent and/or residential schedule has been entered, that decree is *res judicata* and is conclusive in a subsequent application to change the arrangement, unless some new fact has occurred, which fact has altered the circumstances in a material way, so that the welfare of the child requires a change of the original parenting plan. **Long v. Long**, 488 S.W.2d 729 (Tenn. Ct. App. 1972). In short, once the trial court has made an initial determination with respect to a child's residential schedule, it cannot entertain a subsequent petition to modify that arrangement absent a material change in circumstances, such that the welfare of the child demands a redetermination. *See, e.g.,* **Massengale v. Massengale**, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995). A "material change in circumstances" justifying modification of a child's residential schedule may include factors arising after the initial determination or changed conditions that could not be anticipated at the time of the original order. *See* **Blair v. Badenhope**, 940 S.W.2d 575, 576 (Tenn. Ct. App. 1996) (citing **Dalton v. Dalton**, 858 S.W.2d 324, 326 (Tenn. Ct. App. 1993)). If the trial court finds that there has been a material change in circumstances, it will then consider the petition to modify the residential schedule using a "best interest" standard.[3] **Woolsey v. McPherson**, No. 02A01-9706-JV-00125, 1998

---

[3] The best interests factors are enumerated at T.C.A. § 36-6-106, which provides:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. The court shall consider all relevant factors, including the following, where applicable:

> (1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(continued...)

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

(b) Notwithstanding the provisions of any law to the contrary, the court has jurisdiction to make an initial custody determination regarding a minor child or may modify a prior order of child custody upon finding that the custodial parent has been convicted of or found civilly liable for the intentional and wrongful death of the child's other parent or legal guardian.

(c) As used in this section, "caregiver" has the meaning ascribed to that term in § 37-5-501.

(continued...)

499733, at *3 (Tenn. Ct. App. July 16, 1999) (citing **Smith v. Haase**, 521 S.W.2d 49, 50 (Tenn. 1975.)); **McDaniel v. McDaniel**, 743 S.W.2d 167, 169 (Tenn. Ct. App. 1987); **Hall v. Hall**, No. 01A01-9310-PB-00465, 1995 WL 316255, at *2 (Tenn. Ct. App. May 25, 1995). Under this standard, the primary inquiry is whether there has been a material change in the child's circumstances.

We note that the determination of whether a "material change of circumstances" has occurred requires a different standard depending upon whether a parent is seeking to change the primary residential parent, or seeking to modify the existing residential parenting schedule. Tenn. Code Ann. § 36-6-101(a)(2)(B)-(C); **see also Pippin v. Pippin**, 277 S.W.3d 398, 406-07 (Tenn. Ct. App. 2008) (citing **Massey-Holt v. Holt**, 255 S.W.3d 603 (Tenn. Ct. App. 2007)).[4] As previously stated by this Court, "a 'change in circumstance' with regard

_____

[3](...continued)
> (d) Nothing in subsections (a) and (c) shall be construed to affect or diminish the constitutional rights of parents that may arise during and are inherent in custody proceedings.

[4] In pertinent part, Tenn. Code Ann. § 36-6-101(a)(2)(B)-(C) provides:

> (B) If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

> *                              *                              *

> (C) If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a

(continued...)

-7-

to the parenting schedule is a distinct concept from a 'change in circumstance' with regard to the identity of the primary residential parent." ***Massey-Holt***, 255 S.W.3d at 607. Tenn. Code Ann. § 36-6-101(a)(2)(C) establishes a lower threshold for modification of a residential parenting schedule. ***Scofield v. Scofield***, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007) (citing ***Rose v. Lashlee***, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2, n. 3 (Tenn. Ct. App. Aug. 18, 2006) (holding that Tenn. Code Ann. § 36-6-101(a)(2)(C) "sets a very low threshold for establishing a material change of circumstances")).

In ***Kendrick v. Shoemake***, 90 S.W3d 566, 570 (Tenn. 2002) the Supreme Court discusses what constitutes a material change in circumstances and stated that:

> While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." ***Id.*** **(citations omitted). We note that a parent's change in circumstances may be a material change in circumstances for the purposes of modifying custody if such a change affects the child's well-being.**

**If the petitioner makes a prima facie case of a material change in circumstances, then the court must determine whether a change in the primary residential parent, or the child's residential schedule is in the best interests of the child. *In re J.C.S.*, No. M2007-02049-COA-R3-PT, 2008 WL 2924982, at *6 (Tenn. Ct. App. July 28, 2008). This determination requires consideration of a number of factors, including those set forth at Tenn. Code Ann. § 36-6-106(a) to make an initial custody determination, and those set forth at Tenn. Code Ann. § 36-6-404(b) to fashion a residential schedule. *Id.* If no material change in circumstances has been proven, the trial court is not required to make a best interests determination and must deny the request for a change of custody. Tenn. Code Ann. §§ 36-6-101(a)(2)(B)-(C) , 36-6-106. In short, the party seeking to change a child's existing primary residential parent or residential schedule**

---

[4](...continued)
        change in the residential parenting time in the best interest of the child.

has the burden of proving that there has been a material change of circumstances. Tenn. Code Ann. § 36-6-101(a)(2)(B). If the petitioner cannot demonstrate that the child's circumstances have changed in some material way, the trial court should not reexamine the comparative fitness of the parents, *Caudill v. Foley*, 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999), *perm. app. denied* (Tenn. April 17, 2000), or engage in a "best interests of the child" analysis. In the absence of proof of a material change in the child's circumstances, the trial court should not change custody. *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006), *perm. app. denied* (Tenn. Nov. 27, 2006); *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999), *perm. app. denied* (Tenn. May 15, 2000).

At the outset of the hearing on Mr. Hyde's petition, his attorney announced to the court that Mr. Hyde was proceeding on grounds that Ms. Bradley had failed to adhere to the parenting plan. Tenn. Code Ann. §36-6-101(a)(2)(C). Specifically, Mr. Hyde's attorney stated that "Ms. Bradley's...willful failure, to abide by this Court's order regarding custody rises to such a level that it gives [the court] authority to modify custody." Based upon this allegation, Mr. Hyde asked the court to make Mr. Hyde the primary residential parent, or, in the alternative, to award equal parenting time to the parties. In response, Ms. Bradley argued that, any failure to adhere to the court's parenting schedule was because of Mr. Hyde's refusal to pick the child up at the time indicated by the court.

From the totality of the record, it is clear that there is a great deal of animosity between these parties. This is a fact that the trial court acknowledged at the February 19, 2009 hearing, to wit:

> I think y'all both love the child, but it doesn't take a mental genius to see what's going on in some of this matter.
>
> *                    *                    *
>
> [Ms. Bradley], your outright hatred of [Mr. Hyde] is astonishing.... The total hatred that you've got for this man, and I've been on the bench for 23 years, scares me. Whether or not you like it, he is the father of your baby. Whether or not he was there after the baby was conceived, and initially over a year or two, that's water over the dam now....

-9-

The Court also noted Mr. Hyde's part in the parties' problematic relationship, stating that Mr. Hyde had also engaged in behavior to aggravate Ms. Bradley, and that he had been less than forthright in his answers during the hearing. Before sending the parties to parenting classes, the Court further noted that:

> I don't care how much hatred you [i.e., Ms. Bradley] have for [Mr. Hyde], by law, you're going to encourage [the relationship between the] child [and Mr. Hyde], whether you like it or whether you don't like it. Children are not stupid, especially this child.... She's a smart kid and can pick up on mother's hatred of [Mr. Hyde].

Both parties adhered to the trial court's mandate to attend parenting classes. When the hearing resumed, on July 23, 2009, the situation between the parties appeared to be much less volatile. The Court specifically noted that it had "seen a change" in the parties' attitudes. Although the court ultimately declined to change the child's primary residential parent, or the child's residential schedule, it did reiterate the terms of the custody arrangement, and did caution the parties to continue along the path toward peaceful co-existence. The court made no other findings relevant to a determination of material change in circumstances sufficient to change either the child's primary residential parent or the child's residential schedule. Having made no such findings, the court did not reach the best interests analysis.

In *Adelsperger v. Adelsperger*, 970 S.W.2d 482 (Tenn. Ct. App. 1997), *perm. app. denied* (Tenn. May 11, 1998) this court stated the following:

> No decisions in divorce cases require a more delicate touch than those involving child custody and visitation. Courts must strive to devise custody arrangements that promote the development of the children's relationship with both parents and interfere as little as possible with post-divorce family decision-making. *See Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn.1996); *Taylor v. Taylor*, 849 S.W.2d 319, 331-32 (Tenn.1993). These decisions are not intended to reward or to punish parents, *see Barnhill v. Barnhill*, 826 S.W.2d 443, 453 (Tenn. Ct. App.1991), and, in fact, the interests of the parents are secondary to those of the children. *See Doles v. Doles*, 848 S.W.2d 656, 661 (Tenn. Ct. App.1992); *Griffin v.*

**Stone, 834 S.W.2d 300, 302 (Tenn. Ct. App.1992).**

While a parent's misconduct may provide some evidence of his or her fitness to be a child's primary residential parent, this decision is not, and cannot be, used to punish the parent.[5] It is well established that a child's residential schedule is to be made to assure the best interests of the child and not to reward or punish a parent. *See Adelsperger*, 970 S.W.2d at 485 (neither the mother's move to Mississippi, nor her motivation for moving provided grounds for making father the primary residential parent); *Barnhill v. Barnhill*, 826 S.W.2d 443, 453 (Tenn. Ct. App. 1991) (making father the primary residential parent, not to punish the mother for her relationship with another man, but because the father was comparatively more fit); *Long v. Long*, 488 S.W.2d 729, 733 (reversing the trial court's change of primary residential parent to the father, which decision was based on the mother's boyfriend visiting until late hours); *see also Williams v. Williams*, 263 S.W.2d 531, 532 (Tenn. 1953) (noting that, although father was in contempt, best interests of child are paramount). Likewise, in the present case, Ms. Bradley has been previously found in contempt for not allowing Mr. Hyde his ordered visitation; however, Mr. Hyde has often failed to show up on time to pick the child up. In short, there is fault on the part of both parents. However, we cannot go so far as to say that the inappropriate conduct on the part of either parent rises to a level sufficient to warrant a change in the child's primary residential parent or a change in the present residential schedule. In short, there is no proof that there has been a material change in circumstances so as to warrant a change in the current arrangement. Having determined that Mr. Hyde has failed to satisfy his burden to show a material change in circumstances, the trial court did not reach the best interests analysis. We find this issue to be without merit.

## Attorney's Fees

Mr. Hyde asked the court to award him attorney's fees and costs in

---

[5] Both the courts and the legislature have recognized the importance of enabling the child to maintain a relationship with the non-custodial parent. *See Wilson v. Wilson*, 987 S.W.2d 555, 564 (Tenn. Ct. App. 1999); Tenn. Code Ann. § 36-6-106(10). A custodial parent's consistent efforts to thwart a close and continuing relationship between the child and the non-custodial parent through failure to provide visitation could constitute a material change in circumstances since the original order foresaw such visitation. Evidence of such efforts by the custodial parent would also be relevant in a best interests and comparative fitness analysis.

bringing his

petition. After hearing evidence, the court stated that reasonable attorney's fees and costs would be taxed against Ms. Bradley, pending receipt of Mr. Hyde's attorney's affidavit of fees. However, as set out above, the court ultimately denied these fees in its September 10, 2009 order, wherein the court stated that, after review of the affidavit of fees, Ms. Bradley "should be responsible for $0 in attorney's fees and $0 in discretionary fees." Mr. Hyde asserts that this ruling was in error, and contends that he should be awarded the attorney's fees he incurred in the trial court pursuant to Tenn. Code Ann. §36-5-103.

Tenn. Code Ann. §36-5-103(c) provides:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

This statute vests discretionary authority in the court to award such fees in custody cases. *Shofner v. Shofner*, 181 S.W.3d 703, 719 (Tenn. Ct. App.2004). "In determining whether an award for attorney's fees is warranted, we should consider, among other factors, the ability of the requesting party to pay his or her own attorney's fees, the requesting party's success on appeal, and whether the requesting party has been acting in good faith." *Id*. (citing *Parchman v. Parchman*, No. W2003-01204-COA-R3-CV, 2004 WL 2609198, at *6 (Tenn. Ct. App. Nov.17, 2004)). We review the trial court's decision concerning the award of attorney's fees using the less stringent "abuse of discretion" standard of review. *Richardson v.. Spanos*, 189 S.W.3d 720, 729 (Tenn. Ct. App. 2005). Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted). A trial court abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning or that causes

-12-

an injustice to the party complaining." *Id.* The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Id.*

In this case, we find no abuse of the trial court's discretion in declining to award Mr. Hyde his attorney's fees. This finding is true regardless of the fact that the court stated that it would award fees after review of the affidavit of fees. It is well settled that a trial court speaks through its orders. *Palmer v. Palmer*, 562 S.W.2d 833, 837 (Tenn. Ct. App. 1997). In its September 10, 2009 order denying any award of attorney's fees, the court provides no explanation for its decision. It is not the purview of this Court to trace the genesis of this apparent change in the trial court's mind; rather, we must determine if the trial court's ultimate decision is based upon an abuse of discretion. In the instant case, we find that it is not. From the totality of the circumstances, it appears that the financial equities between the parties are fairly even. Moreover, and as discussed above, both parties bear some fault in the failure to adhere to the court ordered parenting plan. From the record as a whole, we conclude that the trial court did not abuse its discretion in denying Mr. Hyde his attorney's fees and costs in this case.

For the foregoing reasons, we affirm the order of the trial court. Costs of this appeal are assessed to the Appellant, Joseph Patrick Hyde, and his surety, for which execution may issue if necessary.

_____
**J. STEVEN STAFFORD, JUDGE**