# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### January 17, 2013 Session

## BRADFORD STAHR FAKES v. PATRICIA NICOLE ZAHORIK

**Appeal from the Juvenile Court for Wilson County**
**No. 03JWC101      John Thomas Gwin, Judge**

**No. M2012-00817-COA-R3-JV - Filed September 11, 2013**

Unmarried parents who had been involved in extensive litigation over custody of their two children finally entered into an agreed order that gave custody of their six year old son to the father and custody of their two year old daughter to the mother. Two years later, the father filed a petition for modification of custody, alleging improper conduct by the Mother. After a hearing, the trial court found that there had been a material change of circumstances and awarded the father primary custody of the little girl. The mother argues on appeal that the trial court's final order was deficient because it did not specifically identify the material change of circumstance that justified reopening the question of custody and because the court did not apply the statutory factors found at Tenn. Code Ann. § 36-6-106(a) to the question of the children's best interest. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Joshua G. Strickland, David Scott Parsley, Michael K. Parsley, Nashville, Tennessee, for the appellant, Patricia Nicole Zahorik.

Andrea Hagan, Anthony Ensley Hagan, Jr., Susan M. Merry, Lebanon, Tennessee, for the appellee, Bradford Stahr Fakes.

## OPINION

### I. BACKGROUND

Bradford Stahr Fakes ("Father") and Patricia Nicole Zahorik ("Mother") lived together, but never married. They became the parents of two children, a son, born in 2000 and a daughter, born in 2004. Father and Mother litigated questions of paternity and custody for several years. They finally entered into an Agreed Order and a Permanent Parenting Plan, which were filed in the Juvenile Court of Wilson County on January 4, 2007. The plan designated Father as the primary parent of the parties' then six year old son, with Mother to have visitation on alternate weekends. Mother was designated as the primary parent of the parties' then two-year old daughter, with Father to have visitation on alternate weekends. No child support was included in the plan.

The current appeal arose from a petition for modification of that parenting plan, filed by Father on November 12, 2009. The petition claimed that there had been a substantial and material change of circumstances since the entry of the agreed order. Specifically, Father alleged that Mother had been abusing drugs and alcohol, that she put the well-being of the children at risk by co-habitating with a man with a criminal record, that Mother refused to answer his phone calls, and that he had to go for days at a time without being able to talk to his daughter.

Father accordingly asked the court for a temporary restraining order giving him temporary custody of his daughter, enjoining Mother from interfering with his custody, and awarding Mother restricted visitation. He also asked that the Permanent Parenting Plan be modified to designate him as the primary custodian of his daughter. The trial court entered the temporary restraining order requested by Father, pending the final hearing.

The parties filed a number of motions after the issuance of the temporary restraining order. As a consequence, among other things, the trial court, by order entered December 29, 2009, enjoined both parties from drinking or consuming alcohol in the presence of the children. Another order, filed on April 19, 2010, enjoined Mother from allowing the children to be around her boyfriend. Also, the paternal grandmother Ms. Stahr Fakes was made a third party defendant in the case and enjoined from making inappropriate remarks about Mother in the presence of the children.

Mother filed an Answer to Father's petition for Modification of the Parenting Plan on September 8, 2011. Her answer denied many of Father's allegations about her behavior and alleged that Father had himself engaged in behavior that should disqualify him from parenting responsibilities. The counter-petition included with Mother's answer asked the

court to name her as the primary residential parent for both children.

## II. FURTHER PROCEEDINGS

Father filed a Petition for Criminal Contempt on May 20, 2010, prior to the filing of Mother's answer to his petition for modification. He alleged that Mother had violated the court's orders by allowing the children to be in the presence of her boyfriend.

The court conducted a hearing on November 22, 2010, and heard evidence relevant to Father's contempt petition as well as to his petition to modify the parenting plan.

Mother testified that she and her boyfriend planned to get married at one point, but that she called off the wedding the day before it was scheduled to happen. Mother stated that she had not allowed any contact between the boyfriend and the children after the entry of the order prohibiting such contact. She also denied almost every allegation Father had made against her regarding any alcohol or drug use after the entry of the agreed order.

The boyfriend was questioned at length about his stormy relationship with Mother, including several incidents of domestic abuse for which he was jailed. He admitted that he had lied to Father's attorney several times about Mother's drug use because he was angry at her and wanted to get her in trouble.[1]

At the conclusion of the day's testimony, the trial court ruled that Father had not met his burden of producing sufficient evidence to show that Mother had violated the court's orders. It accordingly dismissed his petition for contempt. Father has not appealed the dismissal of the contempt petition, so it is not necessary to go into detail about the evidence relevant to that petition.

However, the trial court also heard evidence at this hearing relevant to the petition to modify the parenting arrangement. We will discuss that evidence, as well as evidence presented at the continued hearing, which resumed on October 19, 2011.

---

[1]These lies were apparently the basis of some of the allegations in Father's Petition. In addition, asked when he had last used drugs, the boyfriend testified that it had been about three months earlier. The court asked him if he wanted to change any of his answers regarding his use of drugs, and he said no. The court then ordered that he be immediately drug tested, at which point he admitted that "I did use drugs." He was immediately taken into custody and sentenced to ten days in jail for contempt of court and perjury.

Father testified that he usually works as a delivery truck driver and that he has held a number of different jobs over the years. He has also done home remodeling at times. He was asked about child care when he is at work, and he described the arrangements he made to have the children picked up and cared for after school. He testified that he owns a three bedroom home, so there is a bedroom for each child. Photographs of the home were entered into the record. Father stated that the children were very involved in sports and that he had set up a baseball diamond and a goal post in his backyard for their benefit. Father also testified that he helps the children with their homework and that they have never missed a day of school. The children's report cards were also entered into the record.

Father also testified that he encouraged the children to maintain good relations with Mother. He admitted that his own mother has made ugly remarks about Mother, but he denied that he himself had ever said anything derogatory about her to the children. He also testified that he had a good relationship with Mother's father, and had allowed the grandfather to take Addison on a trip to his alma mater in Minnesota. Mother's father confirmed that testimony and described the trip in very positive terms.

The most damaging testimony against Father came from Mother's private investigator. He testified that he followed Father home from work over several weeks and observed that, on most of those occasions, Father stopped at a convenience store and bought a few beers, which he drank on the way home or while parked in his driveway. A videotape of a few of those incidents, prepared by the investigator, was admitted into evidence. While Father's conduct did not violate the strict letter of the injunction against drinking alcohol in the presence of the children, Mother's attorney correctly pointed out that it was problematic in several respects.[2]

Another testifying witness was Gary Keith, a captain in the Wilson County Sheriff's Department, who lives two houses down the street from Father. The officer testified that his ten year old granddaughter lives with him, that she often plays with the children, and that he has therefore been able to observe Father's interactions with the children. He stated that he has never seen a father so involved in his children's sports and in their education as well. He characterized Father as a good neighbor and a good father, and stated that he would trust Father to take care of his granddaughter and to look after her.

Among other things, Mother asserted that many of the allegations in Father's petition relating to her use and abuse of drugs were false and that others were irrelevant to any proceeding to modify the Agreed Order of January 4, 2007, because they referenced incidents

---

[2]Father also testified that the children told him that Mother purchased beer and consumed it while driving them on two occasions.

that occurred before the filing of that order. She also alleged that Father had a problem with illegal drugs. Mother acknowledged that she had abused drugs in the past, but asserted that she no longer had an alcohol or drug problem, while Father himself "has been unable to conquer his addiction to alcohol." Mother also admitted that she was arrested for one D.U.I. in 2009 and another in 2010.

Dr. Woodman, the psychologist, testified that he had been retained by Father to evaluate the little girl to determine if she had been a victim of sexual abuse. He stated that he had met with Father and with both children, including fourteen sessions with the little girl. He testified that the child had told him that Mother's boyfriend walked around naked in front of the children and that she had made several disturbing statements to him suggesting a strong likelihood that she had witnessed sexual activity. Dr. Woodman admitted that he was uncertain of the exact truth of the sexual abuse allegations, but stated that both children were fairly well adjusted and enjoyed a close connection with each other.

Mother testified that she has worked for Xerox for the past eight years and that her job has most recently involved frequent trips to Tunica, Mississippi, which required overnight stays to work on an ongoing project. Mother also testified that she has not contacted her former boyfriend since he was taken to jail after perjuring himself during the hearing of November 22, 2010, but that he showed up at her front porch about six months earlier and was asked to leave. She also denied that she has dated anyone since. She was asked about several men that she had spent time with, and was asked if she was dating them or if they had ever spent the night at her house.

Mother described several of the men that were named as friends only, including Jed Frankenbach whom she said she had known since high school but never dated. She acknowledged that he had spent the night at her house several times, but testified that it was in conjunction with his children's sleepovers, custody of whom he shared with his estranged wife. Mother was also asked if she ever left her children in her car with the doors locked while she shopped. She admitted that she had done so a few times when she ran into a convenience store for a few minutes, but categorically denied ever leaving them in the car with the motor running.

Mother was also questioned closely about her activities during her stays in Tunica, including how much drinking she did while there. She admitted that she sometimes had a beer or two after a day's work. She denied that she drove after drinking, stating that she used a shuttle to go from the bar at her hotel to the casino. She was also asked if she had ever paid a bartender to keep the bar open after normal closing hours so she could continue drinking. She denied ever having done so.

After Mother finished testifying, Father called Jed's brother William Frankenbach to the stand. He testified that, contrary to Mother's testimony, Jed and Mother had dated in high school. He also testified that he has observed Jed using marijuana, cocaine and prescription pills. He further testified that Jed's wife does not allow him to see his children and that he (William) took out a criminal warrant against Jed for felony assault after Jed tried to run him over in his car.

A licensed private investigator, who had been retained by Father the previous month also testified. Among other things, the investigator testified that at 3:30 p.m. on September 24, 2011, she observed Mother leaving her son in her car with the motor running while she went into a convenience store with her daughter, and that they stayed in the store for thirty minutes before returning to the car.

The investigator also testified that she had followed Mother on two of her trips to Tunica and had closely observed Mother's activities during those trips. She testified to far more drinking than Mother had admitted, including one evening when Mother drank five beers and three shooters during four or five hours and gave the bartender $40 to keep the bar open so she and her male companion could keep drinking. She also testified that Mother drove after drinking several times.

At the conclusion of testimony, the trial court took the case under advisement. It subsequently announced its decision in a letter ruling dated November 30, 2011. Among other things, the court found that Mother had exposed her children to inappropriate behavior The letter also noted that "Mother's credibility had been extremely poor throughout this proceeding," and that although she was given every possible opportunity to testify truthfully, "she steadfastly refused to do so."

The court declared that "[t]here has been a material and significant change in the children's circumstances while their primary residential placement was with Mother," and that after considering all the applicable factors, it concluded that it would be in the best interest of both children to place their primary residential control in Father's hands. The court accordingly ordered Father to submit a proposed parenting plan making him the children's primary residential parent and declared that child support would be calculated in accordance with the guidelines. In a final order filed on January 5, 2012, the court adopted the proposed parenting plan submitted by Father and assessed prospective and retroactive child support against Mother. Mother appealed.

### III. THE STANDARD OF REVIEW

While trial courts have broad discretion to make parenting decisions, their determinations must be made based upon proof and applicable principles of law. *Chaffin v. Ellis*, 211 S.W.3d at 286; *D. v. K.*, 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995). Given the discretion involved and the fact that the decision often hinges on witness credibility, appellate courts are reluctant to second-guess trial judges who have observed the witnesses and assessed their credibility. *Chaffin v. Ellis*, 211 S.W.3d at 286; *Adelsperger v. Adelsperger*, 970 S.W.2d at 485; *Gilliam v. Gilliam*, 776 S.W.2d 81, 84 (Tenn. Ct. App. 1988).

The trial court's findings of fact in a custody matter come to this court with a presumption of correctness. "We therefore review the record de novo in accordance with that presumption, and, absent an error of law, we must affirm, unless we find that the evidence preponderates against such findings." *Griffin v. Stone,* 834 S.W.2d 300, 302 (Tenn. Ct. App. 1992) (citing Rule 13(d) Tenn. R. App. P.; *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984)).

### IV. A MATERIAL CHANGE OF CIRCUMSTANCES

A party petitioning to modify a valid order of custody must follow a two-step process. *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002). First, the petitioning party must prove that a material change in circumstances which affects the well-being of the child has occurred. Tenn. Code Ann. § 36-6-101(a)(2)(B). Then, the party must prove that a modification is in the best interest of the child. Only after a threshold finding that a material change of circumstances has occurred is the court permitted to go on to make a fresh determination of the best interest of the child. *Kendrick v. Shoemake*, 90 S.W.3d at 569; *Blair v. Badenhope,* 77 S.W.3d 137, 150 (Tenn. 2002).

Our courts have stated that there are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody, They have, however, cited several factors upon which to base a determination that a material change in circumstances has occurred: (1) the change has occurred after the entry of the order sought to be modified (2) the change is not one that was known or reasonably anticipated when the order was entered and (3) the change is one that affects the child's well-being in a meaningful way. *Kendrick v. Shoemake*, 90 S.W.3d at 570 (citing *Badenhope v. Blair*, 77 S.W.3d at 150).

The General Assembly has established the guidelines to be followed in determining whether a material change of circumstances has occurred. Tennessee Code Annotated § 36–6–101(a)(2)(B) reads:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

The trial court's final order included several findings of fact, including that Mother was not a credible witness, that she had violated the court's orders relating to parenting the children, and that she had exposed the children to inappropriate behavior. The court also found that there had been "a material and significant change in the children's circumstances while their primary residential placement was with Mother."[3]

Mother challenges some of the trial court's findings of fact and notes that the court did not articulate exactly which of its findings constituted the material change of circumstances it relied upon. We find, however, that the trial court's findings are all sustained by the record and that they constitute a sufficient basis for finding that a material change of circumstances has occurred.

For example, Mother argues that there is a fatal contradiction between the court's finding on the modification petitions that she violated the court's orders and its earlier dismissal of Father's petition for criminal contempt against her. A higher standard of proof is required to sustain a conviction for criminal contempt ("beyond a reasonable doubt") than for a trial court's finding of fact in a civil matter ("preponderance of the evidence"). Thus, although there may be some dispute about whether Mother allowed her boyfriend to be around the children after the court prohibited any such contact, or whether she drank in the presence of the children, there was proof of the prohibited behavior. In light of Mother's lack of credibility, we find that the evidence does not preponderate against the trial court's findings.

---

[3]We note, for clarification, that Mother had been the primary residential parent for the daughter only. We will presume the trial court's statements regarding the children's circumstances relate primarily to the daughter.

-8-

Mother also argues that even if her daughter had witnessed inappropriate behavior, Dr. Woodman himself said that she was well-adjusted and there was no proof that she was affected in an adverse way. However, we note that Tenn. Code Ann. § 36-6-101(a)(2)(B) specifically states that "[a] material change of circumstance does not require a showing of a substantial risk of harm to the child." While the Supreme Court's articulation of the factors to be considered includes a requirement that the change be one that affects the child's well-being in a meaningful way, we cannot conclude that the trial court erred in making this implicit finding. Additionally, other evidence showed additional behavior by Mother that qualifies as a material change in circumstances. In short, we find that Mother's conduct after entry of the agreed order of custody constitutes a material change of circumstance for the purposes of Father's petition for modification of custody.

## V. THE BEST INTEREST OF THE CHILD

The legislature has set out a list of non-exclusive factors for trial courts to consider when determining the best interest of children that are the subject of custody disputes. Tenn. Code Ann. § 36-6-106(a).[4] The court in this case stated that it had considered all the relevant factors and that the children's best interest was "clearly served" by placing their primary residential control in Father's hands. However, the court did not discuss any of the individual factors or refer specifically to any as being especially important in its analysis. Mother challenges the trial court's conclusion and presents her own analysis of the statutory factors, to support her argument that it would be in the children's best interest for them to be

---

[4]The factors set out in Tenn. Code Ann. § 36-6-106(a) include,

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . .

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person . . .

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

placed in her custody instead.

This court strongly encourages trial courts to be as specific as possible when making findings regarding child custody. *Burnett v. Burnett,* No. E2002-01614-COA-R3-CV, 2003 WL 21782290 (Tenn. Ct. App. July 23, 2003) (no Tenn. R. App. P. 11 application filed). Nonetheless, while the statute requires the trial court to consider all the applicable factors, there is no statutory requirement that the court list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination. *Murray v. Murray,* M2009-01576-COA-R3-CV, 2010 WL 3852218 at *8 (Tenn. Ct. App. Sept. 28, 2010) (no Tenn. R. App. P. 11 application filed) (citing *Minton v. Fox*, No. E2005-02740-COA-R3-CV, 2006 WL 3017885 at *5 (Tenn. Ct. App. Oct. 24, 2006) (no Tenn. R. App. P. 11 application filed)).

The children have strong ties of love and affection with both their parents, and both parents are well disposed to provide the children with food, clothing and medical care. Father has exercised custody of both children since November 12, 2009. The proof shows that he has been very involved in their education and activities and that they are doing fairly well in school, although some of their teachers have reported that there is room for improvement.

The conduct by Mother's boyfriend around the daughter, and the testimony of Dr. Woodman and of Father as to what they observed and what they heard from the child herself, is of great concern. Consequently, "the character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child" strongly favors Father. *See* Tenn. Code Ann. § 36-6-106(a)(9). Mother's subsequent choice of Jed Frankenbach as a companion raises additional concerns. Mother's lack of credibility on the stand must factor into the review of the evidence. It is also a consideration in the best interest analysis. The evidence does not preponderate against the trial court's finding that the daughter's best interest is served by modifying the parenting plan to make Father the primary residential parent of the daughter as well as the son. We accordingly affirm the trial court.

**VI.**

We affirm the judgment of the trial court. Remand this case to the Juvenile Court of Wilson County for any further proceedings necessary. Tax the costs on appeal to the appellant, Patricia Nicole Zahorik.

_____
PATRICIA J. COTTRELL, JUDGE

-10-